Marilyn Louise **FRYMAN**, Appellant,

v.

Russell Jerome **FRYMAN**, Appellee.

No. 2–95–235–CV.

Court of Appeals of Texas, Fort Worth.

May 23, 1996.

Rehearing Overruled July 18, 1996.

Michael S. Baskerville, Vernon, for Appellant.

Mark Lewis, Denton, for Appellee.

Before CAYCE, C.J., and LIVINGSTON and BRIGHAM, JJ.

## OPINION

BRIGHAM, Justice.

Marilyn Louise Fryman appeals a declaratory judgment which terminated contractual alimony provided in an agreement incident to her divorce from Russell Jerome Fryman on May 1, 1990. In eleven points of error, she claims that: the automatic alimony termination provision is contrary to public policy and, therefore, void; there is no evidence to support the trial court's finding of fraud; and there is no basis for the trial court's award of attorney's fees. Because we find that the automatic termination clause impedes the authority of a trial court to act in the best interest of children, we reverse the judgment of the trial court and render judgment for Marilyn.

## BACKGROUND

Marilyn and Russell married on August 1, 1974 and had two children: B.C., a son, and W.C., a daughter. B.C. was eleven years old at the time of the divorce, and W.C. was seven years old. Marilyn and Russell agreed on joint managing conservatorship of the children, with primary possession being awarded to Marilyn.

Marilyn and Russell reached an Agreement Incident to the Divorce (AID), which was incorporated into the final decree. The AID gave Russell standard visitation under the Texas Family Code and required him to pay $22,500 per year in child support for both children. Under the terms of the AID, Russell also agreed to pay for a vehicle for each child when he or she turned sixteen years old, to pay for college for each child, and to pay for a life insurance policy for a trustee to guarantee payment of child support.

Russell also agreed to pay Marilyn $1,000 per month in contractual alimony on the condition that the alimony would be terminated upon Marilyn's remarriage, Marilyn's or Russell's death, Russell's disability, or Marilyn's filing "on her behalf or on behalf of the children any modification suit concerning" child support, conservatorship, or visitation.

The AID also stated that "[a]ny suit initiated by [Marilyn] seeking to alter, change, modify, revise or reform any terms of [specified sections] shall immediately and forever extinguish all obligations of [Russell] created by ... this agreement" and that "[i]t is the

intention of the parties to establish that the preceding provisions ... are contractual in nature and that as a condition precedent to the enforcement of any such provisions [Marilyn] must be able to establish that she has not attempted to change, modify, revise or reform any of those provisions." Both Marilyn and Russell were represented by counsel during their divorce, and although Marilyn's attorney advised her not to sign the AID, she did so.

On June 17, 1993, Marilyn filed a motion to modify, claiming that the summer visitation schedule had become unworkable. Specifically, Marilyn claimed that B.C., then fourteen years old, and W.C., then ten years old, wanted to participate in various summer sports and church programs, had expressed their desire to Russell, and that Russell had refused to accommodate them. Marilyn petitioned the court to allow the children to notify Russell, at least thirty days in advance, of their summer activities and to require Russell to permit the children to participate. She asked, in the alternative, to modify the provisions to permit shorter visitation intervals so that the children could schedule their activities around their visitation with their father.

Russell petitioned for a declaratory judgment that Marilyn's attempted modification of the summer visitation schedule terminated his obligation to pay alimony. Marilyn filed a cross-action seeking a judgment enforcing the alimony requirement. The matter was tried to the court on June 26, 1995, and the trial court signed a final judgment in Russell's favor on July 6, 1995.

### POINTS OF ERROR ONE THROUGH FIVE

In her first five points of error, Marilyn contends that the trial court erred in finding that: (1) the alimony provision terminated upon Marilyn's filing of the motion to modify; (2) the termination provision is not contrary to public policy; (3) Marilyn's motion to modify is a breach of the AID; (4) the termination provision is not an unenforceable forfeiture of a contract right; and (5) Russell's alimony obligation is impaired and unenforceable. We find point of error two dispositive of this appeal.

Marilyn relies upon family law and contract law principles in arguing her case. She contends that three appellate courts have addressed this issue during the past five years and that each has found the trial court's ability to act according to the best interest of the children must not be impeded by contractual agreements between parents. *See Leonard v. Lane,* 821 S.W.2d 275 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *Hill v. Hill,* 819 S.W.2d 570 (Tex.App.—Dallas 1991, writ denied); and *Hoffman v. Hoffman,* 805 S.W.2d 848 (Tex.App.—Corpus Christi 1991, writ denied). Marilyn also asserts that contract law supports her position. She claims that the AID forces her to forfeit $135,000 "merely for the filing of her motion to modify" and that such a unilateral penalty bears no relationship to the harm caused by the breach. *See Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991). She claims that $135,000 in liquidated damages is excessive and unreasonable and therefore unenforceable as a matter of law.

Russell maintains that the AID was reached in order to "address all issues regarding the children ... and to avoid future litigation." He argues that during the three years between the divorce and Marilyn's filing of the motion to modify, she "continually frustrated his efforts to have visitation." Although Marilyn describes the modification as "modest" and "innocuous," Russell maintains that it is an attempt to cut him off from his children.

Russell argues that Marilyn is not precluded from filing a motion to modify visitation or support and that the court of continuing jurisdiction is free to enter any order it deems is in the children's best interest. He says that the issue at stake is that of contractual alimony payments from him to Marilyn, which were for her support and subject to certain conditions of termination. He asserts that the only way that Marilyn can succeed is if she can demonstrate that the alimony contract is illegal or against public policy and adds that to do so, she must overcome the rule of law that a contract cannot be contrary

to public policy if it is not in itself immoral or in contravention of law.

We find Marilyn's reliance upon *Hoffman*, *Hill*, and *Leonard* well-founded. Although each of these cases involves modification of child support, we find the reasoning of our sister courts both instructive and persuasive.

In *Hoffman*, the father was ordered to pay child support and also contractually agreed to pay the same amount. *Hoffman*, 805 S.W.2d at 849. The mother filed a motion to modify the child support amount two years after the divorce, claiming that the circumstances of the children had materially and substantially changed since the entry of the original order. *Id.* The father alleged that the child support order and provisions of the divorce decree were contractual and could not be modified absent consent of both parties or in the absence of fraud, accident, or mistake. *Id.*

In affirming the trial court's order increasing child support, the appellate court reminded the parties that the courts are charged with the "responsibility and welfare of minor children in divorce cases ... and ha[ve] a right and duty to modify support orders when justified by the facts and circumstances." *Id.* at 850. *Hoffman* was followed by the First District Court of Appeals in *Leonard*. *Leonard*, 821 S.W.2d at 277.

Most instructive for us is *Hill*, where the mother sought to increase the amount of child support from the father two years after the final decree of divorce and where the father sought a declaratory judgment that the wife breached the marriage settlement agreement. *Hill*, 819 S.W.2d at 571. There, both the divorce decree and the marriage settlement agreement required payment of child support, and the trial court noted that enforcement of the marriage settlement agreement would nullify any increase in child support under the divorce decree ordered by the trial court. *Id.* at 571–72. The husband argued that an agreement which was " 'good for the goose is good for the gander'," but Justice Enoch reminded the parties that the court's primary concern was for the goslings:

> The declaratory judgment in this case permits Husband to nullify, as a practical matter, a court's determination that an increase in the amount of child support is in the children's best interest. When the parties entered into the Agreement, their children were ages two and four. Under Husband's argument, the amounts of child support, once fixed in the Agreement, could not change for the more than fifteen years that its provisions would govern the child-support payments.

*Id.* at 572.

The court refused to "uphold a common-law doctrine that interferes with the court's ability to enforce the laws striving to insure the best interests of the children over whom it has jurisdiction." *Id.* at 573.

■ Marilyn sought to modify the visitation arrangements, claiming that as the children were maturing, they were developing more and stronger interests which conflicted with the summer visitation schedule determined in the AID and incorporated into the divorce decree. Although Russell attempts to distinguish this case from *Hoffman*, *Hill*, and *Leonard* on the basis that support and not visitation were at issue in those cases, we find this a distinction without a difference. Just as a trial court must be allowed discretion to determine the level of financial support according to the best interest of a child, so must it be allowed to determine visitation under the same criteria.

Russell points out that the AID does not prevent the trial court from entering any order in the best interest of the children and that, strictly construed, the AID does not impede the trial court's authority. However, the AID penalizes Marilyn for merely *asking* the trial court to enter an order based upon the best interest of the children and therefore, indirectly, limits the trial court's ability by providing Marilyn with a significant financial incentive to protect the status quo. Russell argues that, even with this financial penalty, Marilyn was not discouraged from petitioning the court for modifications because she, in fact, sought to alter the visitation schedule.

■ Although we concede that Marilyn was apparently willing to risk the contractual alimony in order to further the interests of

the children, we are aware that other, less dedicated parents, might sacrifice the children's well-being by refusing to petition for modifications in order to reap personal financial rewards from a former spouse. Such a hypothetical is easy to construct. Under a similarly-worded AID, a financially-strapped parent faced with an alcoholic or abusive ex-spouse might refuse to seek a modification in custody or visitation, although such a modification might be in the best interest of the children, in order to retain similar contractual alimony. We conclude, therefore, that Marilyn's contention that the termination provision of the AID is against public policy is correct; point of error two is sustained. As a result, we have no need to address her remaining ten points of error.

Upon submission of this appeal, the parties indicated that they had reached an agreement as to payment of attorneys' fees. Costs of this appeal are to be charged against Russell.

The judgment of the trial court is reversed, and judgment is rendered for Marilyn.